Filed 11/18/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>WILSON MORERA-MUNOZ,<br><br>    Defendant and Respondent. | A148325<br><br>(San Francisco County<br>Super. Ct. App. No. APP-15-007903) |

The People challenge the San Francisco Superior Court appellate division's decision finding unconstitutional Vehicle Code section 31,[1] which criminalizes the making of false statements to law enforcement officers while they are engaged in the performance of their duties under that code. Specifically, the appellate division invalidated section 31 on the ground that it improperly restricts speech in contravention of the First Amendment of the United States Constitution because the statute's application is not expressly restricted to the making of "material" misstatements. Based on this conclusion, the appellate division reversed defendant's conviction. The People argue that the statute may be construed or reformed to include a materiality provision, thereby curing any constitutional deficiencies. Construing the statute to include such a provision, we conclude the statute is not constitutionally infirm. In light of this, the jury should have been instructed on the element of materiality. Under the circumstances of this case, however, we conclude the instructional error is harmless beyond a reasonable

---

[1] All further statutory references are to the Vehicle Code except as otherwise indicated.

doubt. Accordingly, we reverse the judgment of the appellate division and order defendant's conviction reinstated.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**I.    *The Arrest and Trial***

Just after midnight on September 2, 2014, a San Francisco police officer was dispatched to investigate a report of a person asleep behind the wheel of a vehicle parked in a lane of travel.[2] Defendant was the vehicle's sole occupant. He was in the driver's seat, slouched forward with his seat belt fastened. The vehicle was not running but the keys were in the ignition. When the officer reached in to retrieve the keys, he noticed an odor of alcohol. The officer then ordered defendant to exit the vehicle and stand on the sidewalk. When questioned, defendant denied having had anything to drink, and said he had been on his way home from work. He agreed to take a breath test, which showed blood-alcohol levels of 0.260 percent and 0.266 percent. He was then arrested on suspicion of driving under the influence.

On September 12, 2014, the People filed a misdemeanor complaint charging defendant with driving under the influence of alcohol (§ 23152, subd (a)—count 1), driving with an 0.08 percent or higher blood-alcohol level (§ 21352, subd. (b)—count 2), providing false information to a peace officer (§ 31—count 3), driving while having 0.01 percent or higher blood-alcohol level while on probation (an infraction) (§ 23154, subd. (a)—count 4), and violating the minimum speed law (§ 22400, subd. (a)—count 5). The complaint also alleged a prior conviction for violating section 23152, subdivision (b), and included allegations that his blood-alcohol content exceeded both 0.15 percent (§ 23578) and 0.20 percent (§ 23538, subd. (b)(2).)

At trial, defendant testified—contrary to his statement to the officer—that on the night of his arrest he was returning from an after-work party at which he "drank a few beers." He had departed from the party with a friend, who drove defendant's vehicle and

---

[2] The parties have not provided us with a reporter's transcript of the trial. However, they do not appear to dispute the relevant facts. We take the facts from the appellate division's opinion and from recitations appearing in the parties' briefs.

later left him inside with the keys in the ignition.  Defendant moved to the driver's seat, fastened the seat belt, and fell asleep.

On January 28, 2015, a jury found defendant guilty of count 3, and not guilty of counts 1 and 2.  The prosecutor dismissed counts 4 and 5 on the same day.  As to count 3, the section 31 count, the jury had been instructed as follows:  "To prove the Defendant guilty of this crime, the People must prove that:  One, the Defendant gave information either orally or in writing; Two, that information was given to [a] peace officer in lawfully performing or attempting to perform his duties as a peace officer; Three, the Defendant knew the information to be false."  The court also read a unanimity instruction for this charge, indicating the People had presented evidence of more than one violation and that all the jurors had to agree on the violation that was proven.  The jury was not required to disclose which violation it selected.

On February 6, 2015, the trial court suspended imposition of sentence and placed defendant on 18 months of probation with various terms and conditions.

## II.    *The Appeal to the Appellate Division*

On February 9, 2015, defendant appealed his conviction to the superior court's appellate division.  In his opening brief, his principal argument was that section 31 is facially invalid under the First Amendment of the United States Constitution because it criminalizes the giving of *any* false information to a peace officer without regard to the information's materiality.

On April 18, 2016, the appellate division reversed defendant's conviction.  The court relied on *United States v. Alvarez* (2012) ___ U.S. ___ [132 S.Ct. 2537] (*Alvarez*), in concluding that section 31 must be interpreted narrowly to require the false statement at issue to have materially affected the performance of the officer's duties.  After finding the statute would not survive intermediate scrutiny without this modification, the appellate division concluded retrial was necessary because the jury had not been instructed on the element of materiality.

On April 20, 2016, defendant requested certification of the judgment for publication.

On April 29, 2016, the People petitioned for rehearing, asking the appellate division to reconsider its definition of "materiality" or, alternatively, to certify the case for transfer to this court.[3]

On May 17, 2016, the appellate division filed a modified final judgment. Rather than define the term materiality more specifically, the court declined to construe section 31 altogether, declaring it unconstitutional and ordering judgment entered in favor of defendant. To assist this court in deciding whether to order the case transferred, the appellate division transmitted a copy of the certified for publication opinion.

On May 25, 2016, we decided transfer was warranted and ordered the case transferred to this court on our own motion. (See Cal. Rules of Court, rule 8.1008(a)(1)(B).)

## DISCUSSION

### I.     *The People's Contentions*

The People assert the appellate division erred when it held section 31 violates the First Amendment because the statute does not specifically target "material" misstatements made to peace officers. Instead of invalidating section 31, the People urge that the appellate division should have construed or reformed the statute to include a materiality provision. The People also argue defendant's conviction should be reinstated because any failure to instruct the jury on the element of materiality was harmless beyond a reasonable doubt.

### II.    *Standard of Review*

Where an issue presented involves the constitutionality of a statute, we review the lower court's determination de novo. (*Vergara v. State of California* (2016) 246 Cal.App.4th 619, 642.) In conducting our review, we adhere to the settled principles that " '[statutes] are to be so construed, if their language permits, as to render them valid and constitutional rather than invalid and unconstitutional' [citation] and that California

---

[3] The appellate division had interpreted section 31 "to apply only to false statements that materially affected the performance of an officer's duties under the Vehicle Code." The People argued this subjective standard was incorrect.

4

courts must adopt an interpretation of a statutory provision which, 'consistent with the statutory language and purpose, eliminates doubt as to the provision's constitutionality.' " (*People v. Amor* (1974) 12 Cal.3d 20, 30; see *People v. Harrison* (2013) 57 Cal.4th 1211, 1228.)

### III. *General First Amendment Principles*

As a general matter, the First Amendment's guarantee of freedom of speech means that government has no power to restrict expression because of its message, ideas, subject matter, or content. (*Alvarez, supra,* 132 S.Ct. at p. 2543; *Ashcroft v. American Civil Liberties Union* (2002) 535 U.S. 564, 573.)[4] The Constitution demands that content-based restrictions on speech be presumed invalid and that the government bear the burden of showing their constitutionality. (*Alvarez,* at pp. 2543–2544.) But while the First Amendment grants individuals broad freedoms with respect to speech, the right to free speech is not without limits. The Supreme Court has repeatedly recognized that certain categories of speech do not enjoy the benefit of full First Amendment protection. (See *Alvarez,* at p. 2544; *United States v. Stevens* (2010) 559 U.S. 460, 468–469 (*Stevens*).)[5] Also, if a statute is content neutral, courts apply intermediate scrutiny, a more lenient test than the test applied to content-based restrictions, because "[c]ontent-neutral [statutes] do not pose the same 'inherent dangers to free expression' . . . that content-based regulations do." (*Turner Broadcast System., Inc. v. FCC* (1997) 520 U.S. 180, 213 (*Turner*).)

---

[4] We observe neither the parties nor amicus curiae address the California constitutional liberty of speech clause. Whereas the First Amendment to the United States Constitution, in relevant part, provides that government "shall make no law . . . abridging the freedom of speech," article I, section 2, subdivision (a), of the California Constitution reads: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

[5] As discussed further below, these categories include obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. (*Stevens, supra,* 559 U.S. at pp. 468–469.)

*IV.* *Section 31*

Enacted in 1965 (Stats. 1965, ch. 1264, § 1, pp. 3139–3140), section 31 provides: "No person shall give, either orally or in writing, information to a peace officer while in the performance of his duties under the provisions of this code when such person knows that the information is false." Legislative history indicates the statute was primarily "intended to curtail [the practice of knowingly giving traffic officers false information] in accident investigation and reporting," with the goal of "mak[ing] the accident reports more valid and prevent[ing] a waste of manpower in disproving such false statements." (Cal. Highway Patrol, memo to Gov. Edmund G. Brown, July 12, 1965.)

A contemporaneous report prepared by the Office of Legislative Counsel on July 8, 1965, does not mention the First Amendment, but does cite to cases pertaining to due process and statutory construction and observes: "A literal construction of this bill would make it unlawful for a person knowingly to give <u>any</u> false information to a peace officer on duty, whether or not it related to and materially affect[ed] the officer's duties under the Vehicle Code. In view of the rules mentioned, however, we are of the opinion that *a court would limit its application* to the giving only of false information *relating to and materially affecting* the performance by the peace officer of his Vehicle Code duties." (Legis. Counsel, Rep. on Sen. Bill No. 123 (1965 Reg. Sess.), p. 2, italics added.)

*V.* *The Appellate Division Erred in Relying on* **Alvarez** *Because Section 31 Does Not Target Protected Speech*

As noted above, in its final judgment the appellate division concluded section 31 does not survive intermediate scrutiny absent a materiality provision. Abandoning its initial attempt to construe section 31 to include a materiality provision, it declared the statute to be unconstitutional. In arriving at its conclusion, the panel relied heavily on the United States Supreme Court's decision in *Alvarez,* which invalidated, on First Amendment grounds, a federal statute criminalizing the making of statements falsely asserting that one had received certain military awards. That opinion is readily distinguishable from the present case.

6

### A. *The Alvarez Decision*

At issue in *Alvarez* was the constitutionality of the Stolen Valor Act of 2005, former 18 United States Code section 704(b), which at that time provided, in relevant part: "Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States . . . shall be fined under this title, imprisoned not more than six months, or both." (*Alvarez, supra*, 132 S.Ct. at p. 2543.) The defendant in *Alvarez* challenged the constitutionality of the statute after the federal government filed charges against him for falsely telling fellow district water board members, at a public meeting, that he had been awarded a Congressional Medal of Honor.

The Supreme Court struck down the Stolen Valor Act in a six-to-three decision, although no opinion garnered a majority of the Court. Writing for the four-justice plurality, Justice Kennedy began by articulating the general rule that "content-based restrictions on speech have been permitted, as a general matter, only when confined to the few ' "historic and traditional categories [of expression] long familiar to the bar." ' " (*Alvarez, supra*, 132 S.Ct. at p. 2544, quoting *Stevens, supra*, 559 U.S. at p. 468.) He listed these categories as follows: incitement, obscenity, defamation, speech integral to criminal conduct, fighting words, child pornography, fraud, true threats, and speech presenting grave and imminent danger. (*Alvarez*, at p. 2544.) Noticeably absent from this list, he noted, is a general exception to the First Amendment for false statements. (*Alvarez*, at p. 2544.) The plurality surmised that this absence "comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." (*Ibid*.)

Justice Kennedy distinguished Supreme Court precedent that the government argued had excepted false statements from First Amendment protections entirely: "These quotations all derive from cases discussing defamation, fraud, or some other legally cognizable harm associated with a false statement, such as an invasion of privacy or the costs of vexatious litigation. [Citation.] In those decisions the falsity of the speech at

issue was not irrelevant to our analysis, but neither was it determinative. The Court has never endorsed the categorical rule the Government advances: that false statements receive no First Amendment protection. Our prior decisions have not confronted a measure, like the Stolen Valor Act, that targets falsity *and nothing more*." (*Alvarez, supra*, at p. 2545, italics added.)

The plurality also addressed three examples (again raised by the government) of criminal laws regulating false speech that courts have generally found permissible: (1) the federal criminal prohibition of a false statement made to a government official, (2) federal and state laws punishing perjury, and (3) federal prohibitions of the false representation that one is speaking as a government official or on behalf of the government. The plurality reasoned that these restrictions "do not establish a principle that all proscriptions of false statements are exempt from exacting First Amendment scrutiny." (*Alvarez, supra*, 132 S.Ct. at p. 2546.) Rather, the plurality found all of these offenses were distinguishable from the criminalization of pure speech.

Significantly, for our purposes, in regard to the federal statute prohibiting false statements to government officials, which punishes "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government . . . [¶] . . . [¶] makes any materially false, fictitious, or fraudulent statement or representation" (18 U.S.C. § 1001), the *Alvarez* plurality observed the statute's prohibition of false statements "made to Government officials, in communications concerning official matters, *does not* lead to the broader proposition that false statements are unprotected *when made to any person at any time* . . . ." (*Alvarez, supra*, 132 S.Ct. at p. 2546, italics added.)

The plurality also noted the same point could be made as to the unquestioned constitutionality of federal and state perjury statutes, reasoning: "It is not simply because perjured statements are false that they lack First Amendment protection. Perjured testimony 'is at war with justice' because it can cause a court to render a 'judgment not resting on truth.' [Citation.] Perjury undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system. [Citation.]

8

Unlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official government action, action that often affects the rights and liberties of others. Sworn testimony is quite distinct from lies not spoken under oath and *simply intended to puff up oneself*." (*Alvarez, supra*, 132 S.Ct. at p. 2546, italics added.)

Finally, the plurality distinguished statutes prohibiting false representations that one is speaking on behalf of the government and/or impersonating a government officer, noting these provisions "also protect the integrity of Government processes, quite apart from merely restricting false speech." (*Alvarez, supra*, 132 S.Ct. at p. 2546.) To the extent such statutes "implicate fraud or speech integral to criminal conduct," the plurality reasoned, they were inapplicable to the issue at hand. The plurality then summarized: "As our law and tradition show, then, there are instances in which the falsity of speech bears upon whether it is protected. Some false speech may be prohibited even if analogous true speech could not be. *This opinion does not imply that any of these targeted prohibitions are somehow vulnerable*." (*Id*. at p. 2546, italics added.)

Having established that the court would not create a new category of unprotected speech for false statements, the plurality turned to the constitutionality of the Stolen Valor Act. Noting that "[t]he Act by its plain terms applies to a false statement made at any time, in any place, to any person," the plurality surmised that the "sweeping, quite unprecedented reach of the statute puts it in conflict with the First Amendment." (*Alvarez, supra,* 132 S.Ct. at p. 2547.) The plurality then proceeded to apply "exacting scrutiny" to the Stolen Valor Act, determining it could not survive. (*Alvarez*, at p. 2548.)[6] Although recognizing the government had compelling interests in protecting the integrity of the Congressional Medal of Honor, the plurality determined the

---

[6] Justice Breyer, joined by Justice Kagan, produced the majority for invalidating the statute. Concurring in the judgment, while applying the test of *intermediate scrutiny,* Justice Breyer agreed that the Stolen Valor Act worked a disproportionate harm to protected speech interests relative to the government's interests advanced by the Act. (*Alvarez, supra*, 132 S.Ct. at p. 2556, conc. opn. of Breyer, J.)

9

government had not shown its chosen restriction on speech was " 'actually necessary' " (*id*. at p. 2549) to achieve its interest or that the restriction was " 'the least restrictive means among available, effective alternatives' " (*id.* at p. 2551).

## B. *Application to the Present Case*

Preliminarily, a look to our Penal Code and Civil Code reveals that there are many categories of speech on which the state has placed certain limitations. For example, our justice system has criminalized perjury (Pen. Code, § 118), the making of criminal threats (*id.,* § 422)[7] and soliciting bribes (*id.,* § 653f). These statutory provisions penalize individuals for their written or spoken words, but each serves an important governmental purpose. Under the Civil Code, we allow individuals to file lawsuits and recover against those who intentionally deceive or defraud, those who defame, and those whose words intentionally inflict emotional distress. This is not to say that all false or hurtful speech falls outside the purview of First Amendment protection. To the contrary, as the plurality in *Alvarez* elucidates in its opinion, the right to free speech does extend protection to some classes of false speech. (*Alvarez, supra,* 132 S.Ct. at p. 2551.)

Similarly, we conclude section 31 legitimately criminalizes the making of false statements that interfere with the proper enforcement of the Vehicle Code. As we have discussed, such statements do not implicate protected expressive activity. Accordingly, on its face the statute under which defendant was convicted does not address speech

---

[7] It is settled that Penal Code section 422 is not unconstitutionally overbroad because it is narrowly tailored to true threats, which are not protected by the First Amendment. (*People v. Toledo* (2001) 26 Cal.4th 221, 233; *In re Ryan D.* (2002) 100 Cal.App.4th 854, 861–862; *People v. Fisher* (1993) 12 Cal.App.4th 1556, 1558–1560.) "[T]he type of threat satisfying the criminal threat provisions of section 422—that is, a threat 'to commit a crime which will result in death or great bodily injury to another person . . . which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat'— constitutes speech that falls outside the protection of the First Amendment." (*Toledo,* at p. 233.)

protected by the First Amendment. Nevertheless, even if we were to assume that it does, we would conclude that section 31's prescription is constitutional.

## VI.     *Section 31 Passes Constitutional Muster Under the First Amendment*

### A.  *Section 31 Is Not a Content-Based Restriction*

The United States Supreme Court has observed, "Deciding whether a particular regulation is content based or content neutral is not always a simple task. We have said that the 'principal inquiry in determining content-neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.' [Citations.] The purpose, or justification, of a regulation will often be evident on its face. [Citation.] But while a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases. [Citations.] Nor will the mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates based on content." (*Turner*, *supra*, 512 U.S. at pp. 642–643.)

In asserting section 31 is content based, defendant relies on *Houston v. Hill* (1987) 482 U.S. 451 (*Hill*). *Hill* is distinguishable. The law at issue in that case made it a crime for citizens to interrupt and/or behave rudely towards police officers. By criminalizing the act of " 'oppos[ing], molest[ing], abus[ing] or interrupt[ing] any policeman in the execution of his duty,' " the statute found unconstitutional in *Hill* was not only content based, but restricted a particular viewpoint—the viewpoint expressing "verbal criticism and challenge directed at police officers." (*Hill,* at p. 461.) As *Hill* noted, the freedom to express that viewpoint "without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." (*Id.* at p. 463.) This type of benign expressive conduct is not what we are dealing with in the present case. Here, we are concerned with persons who give deliberate misinformation to law enforcement officers acting within the scope of their official duties. Additionally, no viewpoint or even general subject matter is singled out by section 31.

As *Alvarez* teaches, there is no general exception to the First Amendment for false statements. (*Alvarez, supra*, 132 S.Ct. at pp. 2544–2545.) But, unlike the Stolen Valor

11

Act analyzed in *Alvarez,* which targets falsity and nothing more, section 31 does not imply the broader proposition that false statements falling within its purview are unprotected when made to *any* person, at *any* time, in *any* context. (*Alvarez*, at p. 2547.) Additionally, the falsities governed here have no value in and of themselves, are necessarily injurious, and do not "chill" otherwise valuable or protected speech. (*Id.* at pp. 2547–2549 [holding that the Stolen Valor Act falters under First Amendment scrutiny given its sweeping reach without any clear limiting principle on the government power it instills].) Section 31 criminalizes only those lies that are particularly likely to produce harm. (See *Alvarez*, at p. 2554, conc. opn. of Breyer, J.)

The People correctly argue that section 31 is content neutral. Defendant disagrees, but concedes that the degree of scrutiny applicable here is intermediate scrutiny under the narrowest holding of *Alvarez*. (See *Alvarez, supra,* 132 S.Ct. at pp. 2151–2152.) Justice Breyer's two-person concurring decision in *Alvarez* (applying the intermediate test) was that narrowest ground, opining with Justice Kennedy's four-person plurality for a six-vote judgment. When a fragmented court decides a case, and no single rationale enjoys the assent of five Justices, " 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " (*Marks v. U.S.* (1977) 430 U.S. 188, 193 (*Marks*).) Amicus curiae American Civil Liberties Union (ACLU) asserts the strict scrutiny test is warranted, but fails to explain why the *Marks* rule does not apply.[8]

---

[8] The ACLU states: "On its face, [section] 31 criminalizes speech based on its content—whether it is false or not. Therefore it is a content-based regulation," citing to *Reed v. Town of Gilbert* (2015) 135 S.Ct. 2218, 2226–2227 (*Reed*). In *Reed,* the high court observed: "Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be ' "justified without reference to the content of the regulated speech," ' or that were adopted by the government 'because of disagreement with the message [the speech] conveys,' [citation]. Those laws, like those that are content based on their face, must also satisfy strict scrutiny." (*Reed,* at p. 2227.) Under *Reed,* content-based speech can be curtailed by narrowly drawn statutes that are tailored to serve a compelling state interest. Here, DUI investigations and investigations of motor

12

Even without considering *Marks,* we believe section 31 is a content-neutral provision.  A statute may be content neutral if it " 'serves purposes unrelated to the content of the expression,' . . . '. . . even if it has an incidental effect on some speakers or messages but not others.' " (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 368, quoting *Ward v. Rock Against Racism* (1989) 491 U.S 781, 791 (*Ward*).)  For example a city may place restrictions on solicitations for immediate donations if it is "predominately . . . addressed to the inherently intrusive and potentially coercive nature of that *kind* of speech, and not to the content of the speech." (*Los Angeles Alliance for Survival v. City of Los Angeles,* at p. 373.)  Or an injunction may issue where one company misappropriates another company's property even where the misappropriation concerns constitutionally protected computer code.  (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 878 (*Bunner*).)  The Legislature's purpose in adopting a statute is the "controlling consideration" in evaluating whether a statute is content neutral.  (*Ward*, at p. 791.)

Here, properly construed, section 31 is addressed towards a purpose *other than* the transmission of a particular message.  It is directed towards false representations, but only to the extent these falsities have the potential to corrupt an official investigation.  Similarly, in *Bunner,* the injunction was not aimed at any particular subject matter, only at trade secrets generally.  Here, section 31 does not focus on any particular subject as *Alvarez* did; it does not endorse a particular view.  It only targets falsehoods when uttered to an officer engaged in the performance of his or her duties.

### B.  Section 31 Survives Intermediate Scrutiny

When a regulation is content neutral, imposing only an incidental burden on speech, the intermediate level of scrutiny is applicable.  (*Turner, supra,* 512 U.S. at p. 662.)  Under this test, a restriction on expressive activity will be deemed valid if " 'it

---

vehicle collisions are both compelling state interests.  These events must be investigated and truthful information is critical to making proper determinations.  While we do not believe strict scrutiny applies, to the extent the investigative process implicates free speech at all, we would find section 31 passes constitutional muster under *Reed.*

furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' [Citation.] [¶] To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests. 'Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." ' " (*Turner*, at p. 662.)

There can be little doubt that false statements made to peace officers acting within the scope of their duties under the Vehicle Code have the potential to disrupt official investigations. The Legislature responded to this problem by appropriately crafting a statute that criminalizes false statements that impede officers from carrying out their official duties under provisions of the Vehicle Code. The section furthers a substantial government interest and is certainly not an example of the government "orchestrat[ing] public discussion through content-based mandates," as discussed at length in *Alvarez*, *supra*, 132 S.Ct. at page 2550. The potential cognizable harm attendant to the utterance of false evidence during a criminal investigation, or even made in the context of private insurance claims, is as serious as the harm attendant to falsely representing that one is speaking on behalf of the government and perjury, both recognized by the *Alvarez* plurality as unprotected speech.

Defendant finds fault with some of section 31's terminology, which he describes as overbroad. Specifically, section 31 does not explicitly limit actionable false statements to statements that are material to an officer's investigation. As we will discuss in more detail below, when properly construed the statute's perceived flaw is rendered moot. Once section 31 is read as containing a materiality requirement, all constitutional standards are met. Further, unlike the Stolen Valor Act, section 31 does not target "falsity alone" (*Alvarez*, *supra*, 132 S.Ct. at p. 2545), nor does it prohibit speech on "one subject in almost limitless times and settings" (*id*. at p. 2547). Rather, the statute's reach is limited to a specific setting (statements made "to a peace officer") where a false

14

statement is offered for a particular purpose ("while in the performance of his duties"). (See § 31.) Thus, it is much more akin to the categories of false speech that the plurality reaffirmed the government could criminalize without running afoul of the First Amendment: false statements to federal officials, perjury, and impersonating government officials. (*Alvarez,* at pp. 2545–2546.) *Alvarez* simply does not stand for the proposition that the First Amendment categorically protects unsuccessful attempts to undermine a government-initiated investigative process by the assertion of false statements.

Section 31 also is unrelated to the suppression of free speech and does not target more speech than necessary. Notably, title 18 United States Code section 1001 is analogous in its scope to section 31. As noted in *Alvarez, supra,* 132 S.Ct. at pp. 2561–2562, this statute makes it a crime to " 'knowingly and willfully' " make any materially false, fictitious, or fraudulent statements or representations "in 'any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States.' " This bar on false statements is not limited to statements taken under oath. (*Alvarez,* at p. 2561, conc. opn. of Breyer, J.) Similarly to 18 United States Code section 1001, section 31 only prohibits intentional deceit to a peace officer about an investigation undertaken pursuant to provisions of the Vehicle Code. While the false statements in *Alvarez* received constitutional protection, the statements at issue were quite broad because the Stolen Valor Act also prohibited false statements made in private. (*Alvarez,* at p. 2547.) Here, the speech targeted by section 31 is much narrower in scope.

Furthermore, title 18 United States Code section 1001 has survived constitutional scrutiny from federal courts. In *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.* (9th Cir. 1982) 690 F.2d 1240 (*Clipper Exxpress*), the Ninth Circuit discussed whether First Amendment protections extended to false statements made to an administrative or adjudicatory body. The appellate court considered the *Clipper Exxpress* defendant's contention that if the First Amendment did not extend to such false statements, "robust debate would be chilled." (*Clipper Exxpress,* at p. 1262.) The Ninth Circuit rejected this argument, recognizing that restrictions on false statements and imposition of criminal liability for such falsities may sometimes "hamper debate," but

15

that "this possibility does not require that all such statements be immunized from liability." (*Ibid.,* citing to *New York Times Co. v. Sullivan* (1964) 376 U.S. 254.)

## VII. *Construed as Including a Materiality Requirement, Section 31 Comports with Due Process.*

The People offer to concede that without the addition of a materiality requirement, section 31 is unconstitutional. Similarly, the ACLU stresses that section 31, as currently worded, is flawed because it "is not limited to 'material' falsehoods" and "there is no necessary connection between the prohibited false information and whether law enforcement resources will be used to disprove it." Like the People, the ACLU notes that without a materiality provision, section 31 "burdens far more speech than is necessary to further the government's interest in preventing the waste of resources to disprove false statements made to an officer during performance of the officer's duties." The ACLU goes on to state: "A narrower statute that criminalizes only materially false information would achieve any compelling government interest in preventing waste of investigative resources."

We agree the statute runs afoul of due process principles unless it is read to include the element of materiality: "It is true . . . that enactments 'which are over-broad are unconstitutional' [citation]. It is also true that a statute which is overly broad in its terms or coverage amounts to denial of due process because it fails to provide a proper definition of the crime intended to be established." (*American Civil Liberties Union v. Board of Education* (1963) 59 Cal.2d 203, 219.) " 'The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution, each guarantee that no person shall be deprived of life, liberty, or property without due process of law. This constitutional command requires "a reasonable degree of certainty in legislation, especially in the criminal law . . . ." [Citation.] "[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." ' [Citation.] If a criminal statute is not sufficiently certain and definite, it is unconstitutionally vague and therefore void. A criminal statute

is unconstitutionally vague on its face only if it is ' "impermissibly vague *in all of its applications.*" ' " (*People v. Maciel* (2003) 113 Cal.App.4th 679, 683.)

In construing section 31, we may rely on principles of "constitutional avoidance": "The doctrine of constitutional avoidance 'command[s] courts, when faced with two plausible constructions of a statute—one constitutional and the other unconstitutional—to choose the constitutional reading.' " (*Voisine v. United States* (2016) ___ U.S. ___ [136 S.Ct. 2272, 2290]; see *United States v. Harris* (1954) 347 U.S. 612, 618.) Additionally, it is settled that courts may construe statutes in a manner that renders them constitutional. In *People v. Chandler* (2014) 60 Cal.4th 508, 525, the court construed the statute for the crime of attempted criminal threat to require proof that the defendant had a subjective intent to threaten and that the intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear, even though the statute on its face would not require the latter element. And in *In re Kay* (1970) 1 Cal.3d 930, 942 (*Kay*), the court construed the statute that facially criminalized any disruption of a public meeting as imposing criminal sanctions only when the defendant's activity itself—and not the content of the activity's expression—substantially impaired the effective conduct of the meeting.

Here, the People place weight on the 1965 document authored by the Legislative Counsel, predicting that courts would read a materiality element into section 31. Counsel believed this judicial intervention would save the statute from overbreadth. (Legis. Counsel, Rep. on Sen. Bill No. 123, *supra*, p. 2.) The People cite to numerous cases where the opinion of the Legislative Counsel is one of deference in judicial review. Defendant argues before us that no deference is warranted because the referenced document was authored *after* the Legislature passed section 31. He further claims all the cases referenced by the People deal with prior opinions before the statute was enacted. Yet the section has been the law for roughly 50 years. The letter in question followed shortly after the statute was passed. In light of the presumption of validity and the desire to avoid constitutional hurdles, and the age of the statute, it is entirely reasonable to conclude the failure of the Legislature to amend the statute reflects its view that the

17

statute is compatible with the Legislative Counsel's opinion.[9]  In any event, applying the doctrine of constitutional avoidance by reading section 31 to contain a materiality provision serves the mandatory presumption the Legislature intends to enact a valid statute.  (See *Kay, supra,* 1 Cal. at p. 942; *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180.)[10]

Properly construed, the speech targeted by section 31 is narrow.  Unlike the Stolen Valor Act, section 31 does not prohibit a certain type of false statement regardless of its setting, whether it is taken in the context of a personal conversation or whether it is uttered within the public domain.  We conclude the statute prohibits deceit only as to a material fact pertinent to an investigatory matter undertaken by a peace officer pursuant to the Vehicle Code.  Further, the statute plainly articulates that the speaker must have the intention to deceive because the speaker must know the false nature of the statement he or she is making to the peace officer.

## VIII.  *The Jury Should Have Been Instructed Regarding Materiality*

We have concluded that for the purposes of criminal prosecution, as was undertaken here, the People are required to prove the alleged misstatement was material in order to comport with due process standards.  It follows that the jury here should have been instructed on the element of materiality.  However, we do not believe retrial is warranted as any error in failing to properly instruct the jury was harmless beyond a reasonable doubt.

We also note it appears the appellate division rescinded its original opinion because it was uncomfortable in defining the standard for materiality, preferring instead to leave that determination to the Legislature.  We believe materiality must be defined by

---

[9] Significantly, section 20 provides:  "It is unlawful to use a false or fictitious name, or to knowingly make any false statement or knowingly conceal any *material fact* in any document filed with the Department of Motor Vehicles or the Department of the California Highway Patrol."  (Italics added.)  This statute was enacted in 1959 (Stats. 1959, ch. 3, p. 1524).

[10] Defendant does not address the statutory principles of constitutional avoidance. This is a significant omission in his briefing.

an objective standard. In a civil context, our Supreme Court has stated that under California law, a misrepresentation is material if " 'a *reasonable man* would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question' . . . ." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 (*Engalla*), quoting Rest.2d Torts, § 538, subd. (2)(a), italics added.) The court also held materiality is a question of fact for the jury, "unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a *reasonable man* would have been influenced by it.' " (*Engalla,* at p. 977, quoting Rest.2d Torts, § 538, com. e, p. 82, italics added.) In a criminal law case involving perjury, courts have held: "An instruction that informs the jury that a false statement is material if it could *probably influence* the outcome of the proceeding is much more consistent with the definition of 'material' . . . . This instruction conveys the requirement that the false statement must be important to the matter under discussion. It also conveys to the jury that false statements on matters not pertinent to the proceeding do not constitute perjury." (*People v. Rubio* (2004) 121 Cal.App.4th 927, 933.)

In the context of 18 United States Code section 1001, the legal standard of materiality is well settled: "Deciding whether a statement is 'material' requires the determination of at least two subsidiary questions of purely historical fact: (a) 'what statement was made?' and (b) 'what decision was the agency trying to make?' The ultimate question: (c) 'whether the statement was material to the decision,' requires applying the legal standard of materiality . . . to these historical facts." (*United States v. Gaudin* (1995) 515 U.S. 506, 512.) " 'The statement must have a "natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed." ' [Citations]. The government is *not required to prove that the statement had actual influence*. 'The false statement must simply have the capacity to impair or pervert the functioning of a government agency.' [Citations.] The statement does not have to be relied upon and can be material even if it is ignored and never read." (*United States v. Boffil-Rivera* (11th Cir. 2010) 607 F.3d 736, 741–742, italics added.)

19

Where state law is identical or similar to federal legislation, federal decisions are a guide to the interpretation of state law. (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 943, fn. 17.) In sum, materiality is not subjective to the listener government officer. Instead it is a review of the *potential* to influence a listener who happens to be a government official in the exercise of his or her official action. The test is, "would a reasonable peace officer find the information relevant and material in his or her investigation?" In other words, is the false statement objectively capable of influencing the behavior of the officer?[11]

## IX.    *Harmless Error*

There is no standard jury instruction on section 31. The judge, without any objection by either party, took the statute and drafted an instruction making the elements listed in the statute as the three elements of the crime. As noted, the jury was not instructed on the element of materiality. This was error.[12] Failure to instruct the jury on an element of the offense is subject to harmless error analysis under *Chapman v. California* (1966) 386 U.S. 18 (*Chapman*). Under this analysis, we ask "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict." (*People v. Magee* (2003) 107 Cal.App.4th 188, 194.)

Both of the questions that defendant falsely answered ("have you been drinking" and "where are you coming from") have a materiality feature to them. The question "have you been drinking" is an obvious and material question in an investigation for DUI. Even defendant appears to concede the question seeks material information. However, the trial court here instructed the jury as to both statements and did not require

---

[11] This objective focus is compatible with the legal understanding of materiality at the time section 31 was passed. In particular, the objective standard was applicable to the crime of perjury at that time. It makes no sense that the Legislature would disregard this state of affairs and call for a subjective standard with respect to section 31. Materiality as a concept is generally the same even though there are different enactments or statutes involved. Defendant provides no sensible basis for contending section 31 would be better understood using subjective materiality instead of the objective established above.

[12] We suspect the error indicated was understandable in light of the absence of appellate guidance interpreting section 31.

the jury to disclose which statement formed the basis of its decision to find defendant guilty. We conclude, however, that the second question is also material and therefore find the instructional error harmless.

The question "where have you been" in the context of the investigation is material. Firstly, the question is relevant to the degree of sobriety (or lack thereof) on defendant's part. Does he have the memory and ability to recall where he had been, or is he so inebriated that he cannot recall such a detail? An answer would help an officer decide whether he was under the influence, since people in such a state often have difficulty recalling prior conduct. Also the question would tend to help officers uncover witnesses and others who might testify for or against the basis for the arrest. A truthful answer could assist the officers in this regard. Therefore, both false statements at issue in the present case are objectively material.[13]

Finally, we know the court told the jury the false statement had to be proved beyond a reasonable doubt. The jury was told they had to be unanimous as to the false statement they found proved. There is no information as to which false statement formed the basis of defendant's conviction. However, we have concluded both statements were material as a matter of law; thus, the failure to instruct on materiality is harmless error under *Chapman*.[14]

## DISPOSITION

The judgment of the appellate division is reversed. Defendant's conviction is hereby reinstated.

---

[13] See *People v. Stanistreet* (2002) 29 Cal.4th 497, 503, dealing with false complaints affecting police conduct in Los Angeles County alone.

[14] As noted above, we were not provided with the transcript of events in the trail court. We have some idea of what was argued, however. It appears the People contended each of the two false statements was material or important in the context of the case. It also appears defendant's counsel argued that defendant did not really understand what was asked because he did not speak English and found the translator confusing. Essentially, he claimed he did not lie, but instead misunderstood the questions. Yet the jury rejected that claim with its verdict.

21

_____
Dondero, J.

We concur:

_____
Margulies, Acting P. J.

_____
Banke, J.

A148325  *People v. Morera-Munoz*

22

Superior Court Appellate Division: San Francisco County Superior Court

Appellate Division Judges: Garrett L. Wong, Presiding Judge, Donald J. Sullivan and Jeffrey S. Ross, Associate Judges

Counsel:

Kamala D. Harris, Attorney General, Gerald A. Engler and Jeffrey M. Laurence, Assistant Attorneys General, Eric D. Share and Amit Kurlekar, Deputy Attorneys General, for Plaintiff and Appellant.

Jeff Adachi, San Francisco County Public Defender, Matt Gonzalez, Chief Attorney, Christopher F. Gauger, Managing Attorney, for Defendant and Respondent.

American Civil Liberties Union of Northern California, Alan Schlosser, Novella Coleman, Angélica Salceda, as Amicus Curiae on behalf of Defendant and Respondent.

A148325  *People v. Morera-Munoz*