# IN THE SUPREME COURT OF IOWA

No. 10–1885

Filed November 4, 2011

**KRISHA BOWMAN,**

Appellant,

vs.

**CITY OF DES MOINES MUNICIPAL HOUSING AGENCY; SCOTT LITTELL** in his Official Capacity as Review Officer and **SARA HENRY,** in her Official Capacity as Occupancy and Program Enforcement Administrator,

Appellees.

---

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

Krisha Bowman appeals the dismissal of her certiorari action challenging the termination of her Section 8 housing assistance. **AFFIRMED.**

Justin J. Gross of Iowa Legal Aid, Des Moines, for appellant.

Gary D. Goudelock, Jr., Assistant City Attorney, Des Moines, for appellees.

**MANSFIELD, Justice**.

Krisha Bowman appeals the district court's dismissal of her certiorari action challenging the termination of her Section 8 housing assistance by the Des Moines Municipal Housing Agency (DMMHA). DMMHA discontinued Bowman's housing assistance based on five alleged occurrences of unreported income. Bowman argues that she did not have five such occurrences; that even if she did, DMMHA's policy of treating a failure to report each child's Social Security benefits as a separate occurrence of unreported income violates the Fair Housing Act; and that DMMHA improperly failed to consider mitigating circumstances before terminating her assistance.

We conclude: DMMHA's determination that Bowman had five occurrences of unreported income is supported by substantial evidence, DMMHA's policy does not violate the Fair Housing Act, and DMMHA did not improperly fail to consider Bowman's mitigating circumstances. Accordingly, we affirm the judgment of the district court denying Bowman's petition for writ of certiorari.

## I. Background Facts and Proceedings.

In 1974, Congress enacted a housing assistance program commonly known as the "Section 8" program. *See* 42 U.S.C. § 1437f (2006). Under this program, federal dollars are used to fund both project-based and tenant-based housing assistance for low-income families. *See Horizon Homes of Davenport v. Nunn*, 684 N.W.2d 221, 222–23 (Iowa 2004) (describing the Section 8 program). This case involves tenant-based assistance in the form of rental vouchers. *See* 42 U.S.C. § 1437f(o). Although the funding comes from the federal government, the program is administered on a local basis by public housing authorities (PHA), such as DMMHA.

A low-income family may apply to the PHA and, if approved, receive a voucher from the PHA to cover a portion of their rent. *See* 24 C.F.R. §§ 982.302, 982.305 (2010). Under certain circumstances, however, Section 8 voucher assistance may or even must be terminated. *See id.* § 982.552. One of the permissive grounds for termination is when the family violates any "family obligations." *Id.* § 982.552(c)(1)(i). A specific family obligation is to supply any information the PHA determines is necessary in the administration of the program. *Id.* § 982.551(b)(1). Additionally, the family must supply any information requested by the PHA for use in a regularly scheduled or interim reexamination of family income. *Id.* § 982.551(b)(2).

DMMHA requires Section 8 participants in Des Moines to sign a two-page "Statement of Family/Household Obligations." Among other things, the participant certifies that he or she will report to the case manager in writing within ten days "any increase or decrease or change of the source of household income." The participant also acknowledges that his or her housing assistance may be terminated for a violation of any family obligation in the program.

In 2008, the Des Moines Municipal Housing Board approved DMMHA's proposed revision of its policy on processing instances of unreported income "to better define for their clients and staff how unreported income will be calculated." The new policy stated, "The family will be afforded a total of four (4) occurrences of unreported income. More than four (4) occurrences of unreported income is grounds for termination of benefits." DMMHA adopted this four-occurrence policy to replace a previous policy that allowed only one occurrence before termination.

Krisha Bowman, a single mother, resides in Des Moines with her three minor children. Bowman began participating in the Section 8 housing program in approximately 2000. In the ensuing years, she continued to participate in the program and signed a number of "Statement[s] of Family/Household Obligations" referring to her obligation to report changes in the amount or source of household income. There is no indication that Bowman ever violated the terms of her Section 8 housing assistance before 2009.

Bowman suffers from multiple sclerosis, and on February 2, 2009, she had to quit her job and immediately enter the hospital. Four days later, she faxed a note to DMMHA advising it of these facts. Subsequently, Bowman applied for benefits from the State of Iowa and the Social Security Administration. On April 8, 2009, Bowman began receiving Family Investment Program (FIP) benefits from Iowa. This did not come to the attention of DMMHA until June 4, 2009, when the agency conducted a family income and asset review with Bowman as part of its annual recertification appointment with her. The review included a detailed questionnaire regarding sources of income. Following that review, Bowman was notified in writing that her file was under review for unreported income.

On June 12, 2009, and again on July 10, 2009, DMMHA sent letters to Bowman asking her to verify the child support she received and the amount kept by the state during 2009. Bowman apparently did not respond to these letters.

On July 20, 2009, Bowman provided DMMHA with a copy of a June 19, 2009 letter from Social Security indicating that she (Bowman) would be receiving $946 per month in Social Security disability benefits.

On July 23, 2009, DMMHA advised Bowman that it had completed the aforementioned investigation and that she had received unreported income, i.e., the FIP benefits. After recalculating the amount of housing assistance Bowman should have received, DMMHA directed Bowman to repay $252 by September 21, 2009. The letter further indicated that a failure to make full payment by the deadline would result in termination of her housing assistance.[1] The letter concluded, "Please be advised that further instances of unreported income may lead to immediate termination of assistance."

Bowman did not make the $252 payment by September 21, so on September 28, DMMHA requested she attend a meeting.[2] Bowman went to the meeting on October 12 with her mother. At the meeting, Bowman told DMMHA she had sent in a money order four days before. Later that day, Bowman provided DMMHA with a receipt for a $252 money order she had obtained on October 6. DMMHA subsequently received the $252 money order in the mail on October 13.

At the October 12 meeting, Bowman revealed she had stopped getting FIP in July 2009 and had started receiving $140 per month in Social Security disability payments for each of her three children. According to her petition (and to DMMHA's records), Bowman also informed the agency at the meeting that she had resumed receiving child

---

[1]Failure to repay amounts owed the PHA is a separate ground for permissive termination. *See* 24 C.F.R. § 982.552(c)(1)(v). Also, each Statement of Family/Household Obligations signed by Bowman indicated that housing assistance may be terminated if household members owed rent or other amounts to DMMHA in connection with the Section 8 program.

[2]An internal DMMHA memo indicated that termination of housing assistance had been approved as of September 28, 2009, when Bowman failed to make the $252 payment within sixty days.

support of $35 per month.[3]  Bowman learned of the disability awards in three separate letters dated June 28, 2009—one addressed to each child. Bowman had received all three letters the same day.  Bowman claimed she was unaware she had to disclose the children's Social Security payments to DMMHA because they were "for my children's needs."

On November 30, 2009, Bowman and her mother attended another meeting with DMMHA.  At that meeting, Bowman was notified of DMMHA's intent to terminate her participation in the Section 8 program based on five instances of unreported income—i.e., the FIP income, the child support, and the Social Security disability payments for each of the three children.  A formal notice was issued that same day, informing Bowman her participation would be terminated effective December 31, 2009.

After receiving the termination notice, Bowman requested an administrative hearing.[4]  A recorded hearing was held on January 4, 2010, before a hearing officer.  At the hearing, Bowman explained she had failed to report the FIP benefits because she "thought all the government agencies were together."  Bowman continued to maintain she was unaware the children's Social Security income needed to be reported.  She also contended the benefits received for the children should be treated as one instance and not three separate instances of unreported income.

---

[3]While Bowman was receiving FIP, the State of Iowa kept her child support payments.  After her FIP payments ended, the child support payments went once again to Bowman.

[4]The regulations require the PHA to give a participant "an opportunity for an informal hearing to consider whether [the decision to terminate assistance was] in accordance with the law, HUD regulations and PHA policies."  24 C.F.R. § 982.555(a)(1).

DMMHA made clear at the hearing that "we're not saying fraud, we're saying unreported income." DMMHA also conceded that the child support and Social Security disability payments to the children would not have reduced Bowman's Section 8 housing assistance even if they had been timely reported. Bowman's mother joined her at the hearing and testified that Bowman had suffered from multiple sclerosis for about four or five years, but did not go onto disability until 2009. She explained that Bowman could not afford her rent without Section 8 assistance. Bowman also testified regarding her medical condition and her hospitalizations in 2009.

DMMHA presented proof at the hearing that Bowman was aware of the obligation to report changes in income and sources of income. That is, Bowman had faxed information to DMMHA about the loss of her job in February 2009 and had also provided information about her personal receipt of Social Security disability benefits in July 2009. DMMHA also maintained that its consistent policy is to treat any situation where a separate family member receives a new source of income as a separate occurrence.

The hearing officer said, "I'm going to take everything into consideration." He then issued his decision three weeks later on January 25, 2010. The decision found that Bowman's assistance had been properly terminated for the following reasons:

> There are clear violations of the federal regulations governing the Section 8 voucher program guidelines. As evidenced by the exhibits, the participant[] knew the rules regarding reporting income within ten days. The participant[] stated she did not believe the children's benefits needed to be reported because they were not adults. The family obligations clearly state any household income must be reported within ten days in writing. The participant had just found out at her annual recertification on 6/4/09 that one instance of unreported income had occurred when she did

> not report her FIP within ten days. The participant received the three letters dated 6/28/09 regarding Social Security benefits for her children approximately one month after her annual appointment. If the participant did not know if this income should be reported then she should have called her case manager to find out.
>
> Therefore, I am upholding the Housing Agency's termination of benefits based on the above findings.

Bowman thereafter filed a petition for writ of certiorari in the Polk County District Court, raising three issues for review: (1) whether the hearing officer's decision to uphold termination was supported by substantial evidence given that three instances of unreported income involved income from the same source at the same time, (2) whether DMMHA's application of its policy violated the Fair Housing Act because it discriminated based on familial status, and (3) whether the hearing officer abused his discretion by not considering mitigating factors.

The district court affirmed the hearing officer's decision on these points. The district court found DMMHA's decision to terminate was supported by substantial evidence because each Social Security benefit was covered by a separate letter and each was for a separate child. The court also noted Bowman's testimony that she had used each child's benefit check for that child's needs.

Additionally, the district court said it was "not entirely convinced" Bowman had preserved the issue of familial status discrimination for review, finding her only attempt at preservation was "questioning the program administrator about treating families differently based on the number of children." Despite this concern, the court addressed the Fair Housing Act claim and denied it. As it explained, "[T]he violations are not caused by the number of children, but rather by the number of incomes."

Lastly, the court rejected Bowman's claim that the hearing officer abused his discretion by failing to consider mitigating circumstances. Since 24 C.F.R. § 982.552(c)(2)(i) states a hearing officer "*may* consider all relevant circumstances," the court held the hearing officer was not required to consider such factors as Bowman's illness, her no-violation history of nearly ten years, and the effect of the hearing officer's decision on Bowman's children—even if one assumes these factors were not taken into account. The district court's reading of § 982.552(c)(2)(i) as permissive, not mandatory, in construction was reinforced in its view by the definition of "may" in the Iowa Code which states the word "may" merely invokes a power, not a duty. *See* Iowa Code § 4.1(30) (2009) (differentiating "shall," "must," and "may"). The court also compared § 982.552(c)(2)(i) with other federal housing provisions that employ the word "must" to demonstrate § 982.552(c)(2)(i) was not intended by its drafters to impose an obligation on hearing officers to consider mitigating circumstances. *See* 24 C.F.R. § 982.552(d) (indicating the housing authority "must" supply participating families with certain information). The district court reasoned that if the federal government had intended § 982.552(c)(2)(i) to impose a mandatory duty upon hearing officers to consider mitigating circumstances, it would have expressed that intent in the plain language of the statute as it did elsewhere.

Bowman appeals.

## II. Standard of Review.

We review a certiorari action for the correction of errors at law. *Meyer v. Jones*, 696 N.W.2d 611, 613–14 (Iowa 2005). A certiorari action may be asserted by a party when authorized by a statute or when an "inferior tribunal, board, or officer" exceeded its jurisdiction or otherwise acted illegally in executing judicial functions. Iowa R. Civ. P. § 1.1401;

*Meyer*, 696 N.W.2d at 614. An inferior tribunal commits an illegality if the decision violates a statute, is not supported by substantial evidence, or is unreasonable, arbitrary, or capricious. *Perkins v. Bd. of Supervisors*, 636 N.W.2d 58, 64 (Iowa 2001). Substantial evidence, as defined in Iowa Code section 17A.19(10)(*f*)(1), is

> the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

If the inferior tribunal's decision is supported by substantial evidence, we are bound by the findings in the record. *Perkins*, 636 N.W.2d at 64; *see also Bontrager Auto Serv., Inc. v. Iowa City Bd. of Adjustment*, 748 N.W.2d 483, 495 (Iowa 2008).

**III. Analysis.**

**A. Three Instances of Unreported Income or One?** Bowman challenges DMMHA's decision to treat the unreported Social Security benefits for the children as three separate violations, thereby resulting in a total of five violations. DMMHA does not dispute that Bowman preserved this specific argument. The question for review is whether substantial evidence supports DMMHA's approach. We believe it does.

Bowman received three separate benefits letters from the Social Security Administration. Each identified a different child as the benefits recipient. Each letter began as follows:

> [Child's name] is entitled to monthly child's benefits beginning July 2009.

> We have chosen you to be her representative payee. Therefore, you will receive her checks and use the money for her needs.

Bowman informed the hearing officer that she followed the Social Security Administration's instructions to use each child's payment for the benefit of that child. Thus, we believe the hearing officer's conclusion that these were three separate occurrences of unreported income is supported by substantial evidence.

Bowman contends there is an inconsistency between the way Social Security benefits are treated and the way child support is treated. Her failure to report the receipt of child support was considered one violation by DMMHA, even though the failure covered a period of months. Like the district court, though, we are not persuaded the treatment is inconsistent. In this case, there were three separate monthly Social Security payments covering separate beneficiaries, albeit from a single source. The child support, on the other hand, involved a single monthly payment of $35, and there is no indication it was intended to cover more than one child.

Bowman also contends that according to a U.S. Department of Housing and Urban Development (HUD) guidebook, PHAs are supposed to distinguish between mistakes and fraud or abuse. Bowman's actions (or inactions), she maintains, amounted only to mistakes. However, DMMHA urges, and we agree, that this argument was not raised before the hearing officer or the district court. The HUD guidebook was included in our appendix, but is not part of the record. Therefore, we decline to consider this argument.[5]

Finally, Bowman contends on appeal that her failure to report the receipt of child support should not have been treated as a violation

---

[5] *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

because she was unaware the child support was being deposited into her account. However, Bowman did not raise this argument before the district court, and understandably, the district court did not address it. Nowhere in her briefing before the district court did Bowman challenge DMMHA's decision to treat the failure to report child support as a violation. In fact, in her petition for certiorari, Bowman alleged (or conceded):

> At the informal discussion on October 12, 2009, Ms. Bowman conveyed to her case manager that her FIP benefits ended in August and she was now receiving child support again. Ms. Bowman was unaware of the child support being deposited on her card until right before the meeting.

We decline to consider an argument that is raised for the first time on appeal. *See id.*[6]

---

[6]The date when Bowman became aware she was again receiving child support is somewhat unclear.

As noted in the main text, Bowman alleged in her certiorari petition that she learned she was receiving child support again "right before" the October 12 meeting and told her case manager about it at the meeting.

DMMHA's records are consistent with this timing. According to a DMMHA internal memo, Bowman "reported" at the October 12 meeting "that she is no longer receiving FIP but now receives Child Support." In its November 30 letter, DMMHA reiterated to Bowman, "At the 10/12/09 informal discussion, you also confirmed that you did not report when your FIP ended and you began getting Child Support again."

Later, at the informal hearing, Bowman testified she "didn't even know" she was getting the child support again because it went on her debit card. However, in her hearing testimony, Bowman was vague as to when she allegedly found out her receipt of child support payments had resumed. First, she testified that she learned of this when she received the November 30 letter. Later, she testified she had learned in August that the child support payments had resumed. The record does not show when Bowman actually accessed the debit card.

Although the record is somewhat unclear, DMMHA did not know about Bowman's receipt of child support payments before Bowman did. DMMHA had no access to Bowman's child support data. Each time it wanted to obtain this information, it had to rely on Bowman's voluntary reporting or have Bowman sign a release. Thus, DMMHA asked Bowman to execute a release on November 3, 2009, which enabled DMMHA to obtain a record from Child Support Recovery showing that Bowman's regular receipt of child support payments had resumed on July 31, 2009.

**B. Disparate Impact of DMMHA's Four-Occurrence Policy?**

Bowman next asserts DMMHA discriminated against her based on familial status in violation of the Fair Housing Act by counting her failure to timely report each of her three children's Social Security benefits as three separate occurrences. *See* 42 U.S.C. § 3604 (prohibiting rental discrimination based on familial status). Bowman argues that this practice discriminates against large families. As Bowman observes, if she had only one child, or even two, her housing assistance would not have been terminated.

The district court was "not entirely convinced" Bowman preserved error on this issue. Nor are we. Bowman's counsel posed a hypothetical question to DMMHA's representative at the hearing as to whether Bowman, with no previous violations, would have been automatically terminated under the four-occurrence policy for failure to report benefits for five children instead of three. Furthermore, in response to the discussion of how DMMHA calculated the number of occurrences, Bowman's mother said, "My analogy is if the family only has one child versus a family with four . . . ." No suggestion was made at the hearing, however, that DMMHA's "separate occurrence" approach violated the Fair Housing Act. In fact, no one mentioned the Fair Housing Act. *See Bontrager*, 748 N.W.2d at 487 (noting that issues must first be presented to the agency in order to be preserved for appellate review). Regardless, even if we were to find this argument had been preserved, we would not be persuaded by it.

The Fair Housing Act prohibits discrimination based on familial status, either by disparate treatment or impact. *See* 42 U.S.C. § 3604; *see also* Iowa Code § 216.8 (prohibiting discrimination in housing based on familial status under the Iowa Civil Rights Act). The Fair Housing Act

defines a "family" as including "a single individual" and "familial status" as including "one or more individuals" under eighteen years of age domiciled with a parent. 42 U.S.C. § 3602(c), (k); *see also* Iowa Code § 216.2(9) (defining "familial status").

On its face, DMMHA's policy treats all families the same way. DMMHA's four-occurrence policy indicates "the *family* will be afforded a total of four (4) occurrences of unreported income" (emphasis added). Bowman argues, however, that the policy as administered has a disparate impact on larger families. We disagree. A disparate impact means a "disproportionate impact." *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382, (3d Cir. 2011). Under the DMMHA policy, larger families have more potential income beneficiaries and thus, more situations where a failure to report income could occur. They also have more persons who could potentially commit acts that provide other, independent grounds for termination of housing assistance—for example, damaging the unit or premises, engaging in criminal activity, etc. But these effects are not disproportionate. Large families may present more circumstances that could be treated as a violation, but not disproportionately more. This is unlike a rule limiting the number of people who can occupy a unit, for example. *See United States v. Badgett*, 976 F.2d 1176, 1178–80 (8th Cir. 1992). At least on the record before us, we agree that Bowman has failed to prove a disparate impact.

**C. Mitigating Circumstances?** Finally, Bowman asserts DMMHA illegally terminated her housing assistance because the hearing officer, in abuse of his discretion, failed to consider mitigating circumstances including her multiple sclerosis, her loss of employment, her almost ten-year program record with no violations, the lack of impact that the

unreported income would have had on the amount of her housing assistance, and finally, the effect of termination of housing assistance on her children. DMMHA concedes Bowman preserved this issue for review.

The relevant federal regulation provides:

(2) Consideration of Circumstances. In determining whether to deny or terminate assistance because of action or failure to act by members of the family:

(i) The PHA *may consider* all relevant circumstances such as the seriousness of the case, the extent of participation or culpability of individual family members, *mitigating circumstances* related to the disability of a family member, and the effects of denial or termination of assistance on other family members who were not involved in the action or failure.

24 C.F.R. § 982.552(c)(2)(i) (emphasis added).

DMMHA argues that this regulation, framed as a "may" rather than a "must," gives the hearing officer discretion whether or not to consider mitigating factors. We agree. In *Peterson v. Washington County and Redevelopment Authority,* the Minnesota Court of Appeals resolved a split in its earlier unpublished decisions regarding the hearing officer's duty to consider mitigating factors. 805 N.W.2d 558, 563–64, (Minn. Ct. App. 2011). In considering the claim of a Section 8 tenant whose housing assistance was terminated for failing to report public-assistance income, despite the tenant's "challenging personal circumstances," the Minnesota court held:

[A] hearing officer is not required to consider mitigating factors . . . when deciding whether a [tenant's] violation of a reporting rule is a terminable offense. While the hearing officer *may* consider mitigating factors, the regulations do not require it, allowing for strict application of a local reporting rule like the one Peterson violated.

*Id.* at 564; *see also Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergovernmental Affairs*, 393 F. App'x. 791, 794 (2d Cir.

2010) (holding that consideration of mitigating factors "by the housing agency is discretionary under the federal regulations [and a]s a result, the housing agency's failure to consider those factors in terminating benefits in this case was not improper"); *Dowling v. Bangor Hous. Auth.*, 910 A.2d 376, 384 (Me. 2006) (stating that "[t]he weight to be given to such mitigating factors . . . is within the discretion of the Authority").[7]

Nonetheless, Bowman, citing *Carter v. Lynn Housing Authority*, 880 N.E.2d 778 (Mass. 2008), argues that the hearing officer has to indicate an *awareness* that he or she had the discretion to take into account relevant mitigating circumstances and also must indicate whether he or she decided to exercise that discretion in favor of mitigating the penalty. In *Carter*, the tenant received a notice of termination of her Section 8 housing assistance because the PHA concluded her family had caused "waste" to her apartment. (A landlord had obtained a small claims judgment for damages to the apartment.) 880 N.E.2d at 781. The tenant requested a hearing, where she contested the alleged "waste." *Id.* The hearing officer concluded the "waste" had occurred and found that termination was proper, without mentioning the potential discretion afforded by § 982.552(c)(2)(i) of the regulations. *Id.* at 782. The case ultimately reached the Massachusetts Supreme Judicial Court, which held the termination of housing assistance was improper because the hearing officer failed to make any findings relating to the family's individual circumstances and did not indicate "any awareness that he

---

[7]In *Gaston v. CHAC, Inc.*, 872 N.E.2d 38 (Ill. App. Ct. 2007), the court read § 982.552(c)(2)(i) somewhat differently, reasoning that the PHA "must consider some circumstances particular to the individual case, otherwise section 982.552's distinction between mandatory and discretionary terminations becomes meaningless." 872 N.E.2d at 45. With respect, we do not follow this argument. If the PHA "may" consider mitigating factors, then it may consider all of them, some of them, or none of them. This does not render the distinction between mandatory and discretionary terminations "meaningless" because the PHA retains the discretion not to terminate.

was explicitly authorized by HUD to exercise his discretion to take into account relevant circumstances," such as the tenant's "obvious" hearing disability and economic fragility. *Id.* at 785–87. As the court explained:

> The [housing authority] argues that, while the hearing officer "may" consider "all relevant circumstances," 24 C.F.R. § 982.552(c)(2)(i), he is not required to do so. That assertion misses the mark. It presupposes the predicate issue that forms the crux of this dispute: whether the hearing officer recognized that he had discretionary authority to consider relevant circumstances.

*Id.* at 785.[8]

DMMHA cites us, however, to *Robinson v. District of Columbia Housing Authority*, 660 F. Supp. 2d 6 (D.D.C. 2009). There a tenant whose Section 8 housing assistance had been terminated for having an unauthorized co-occupant brought an action pursuant to 42 U.S.C. § 1983. *Robinson*, 660 F. Supp. 2d at 9, 11. Among other things, the tenant alleged the PHA had failed "to exercise discretion and adequately consider the circumstances and impact the termination would have on the plaintiff and her family." *Id.* at 16. The tenant pointed out that "nothing in the Informal Hearing Decision indicates that the Hearing Officer considered such factors." *Id.* at 17. Yet the court concluded:

> Given the language and plain meaning of the words used[,] 24 C.F.R. § 982.552(c)(2)(i), the Court must defer to the agency's interpretation of the regulation and therefore, the Hearing Officer was under no obligation to explicitly consider the mitigating circumstances presented at the informal hearing by the plaintiff.

*Id.* The court distinguished *Carter* on the ground that Robinson had testified on her mitigating factors. *Id.* The court also noted that the hearing officer's decision in Robinson's case contained factual findings

---

[8]There was apparently no transcript or recording of the actual hearing in *Carter*. 880 N.E.2d at 791 n.7 (Ireland, J., dissenting).

that enabled meaningful review, although there were no findings on the mitigating factors. *Id.* In any event, the court concluded that the hearing officer's failure to expressly reference the mitigating factors in his decision could not provide the basis for a claim. *Id.*

We agree with the *Robinson* court that § 982.552(c)(2)(i) does not require the hearing officer to state specifically whether he or she considered the mitigating factors brought forth by the tenant, at least where circumstances indicate the hearing officer was aware of his or her discretion to consider those factors. To hold otherwise would overlook what the regulations provide. They specify only that the hearing officer must "stat[e] briefly the reasons for the decision." 24 C.F.R. § 982.555(e)(6).[9] HUD actually rejected a rule requiring the hearing officer to include both legal and evidentiary grounds for his or her decision. *See* 49 Fed. Reg. 12215, 12230 (March 29, 1984).

In this case, unlike in *Carter*, the tenant presented considerable evidence on mitigating factors. Bowman's attorney opened his examination of her with the question, "What happened last February?" Bowman proceeded to describe her difficult personal circumstances, including her hospitalizations and loss of her job. The hearing officer mentioned some of Bowman's testimony in his decision under "Position of Participant," noting, "The participant has been in and out of the hospital because of a Multiple Sclerosis relapse." Furthermore, at the end of the hearing, the hearing officer said: "I got it. Both positions. I understand what each one is saying . . . . There's a lot of stuff to go through here. I'm going to take everything into consideration . . . ."

---

[9]There is no dispute that the hearing officer here provided factual grounds for his decision. *Cf. McCall v. Montgomery Hous. Auth.*, ___ F. Supp. 2d ___, ___, 2011 WL 4025644, at *9 (M.D. Ala. 2011) (holding that under § 982.555(e)(6), a decision that "did not contain any reasons whatsoever for the decision" was deficient).

Given these circumstances, we find that the hearing officer realized he had the discretion to consider Bowman's mitigating factors, but simply declined to conclude they warranted a decision not to terminate her housing assistance.

We agree with Bowman that a better practice might have been for the hearing officer to state expressly in his decision that he had received her mitigating evidence and to describe the extent to which he considered it. Nonetheless, in light of the express language of HUD's regulations, we cannot conclude Bowman has established a violation of 24 C.F.R. § 982.552(c)(2)(i).

## IV. Conclusion.

A decision not to terminate Bowman's housing assistance would have been well within DMMHA's discretion. There is no assertion that Bowman intended to deceive DMMHA; she had a clean record of no prior violations in almost ten years; she had undergone hospitalizations; she had lost her job; her last four failures to report income all related to the same transition from FIP benefits to Social Security disability benefits; and none of those last four instances resulted in Bowman paying less rent than she should have paid. DMMHA would presumably respond that in allocating scarce Section 8 benefits for which there is a waiting list, it could enforce the four-occurrence limit strictly, especially since Bowman understood the obligation to report new sources of income, and the four-occurrence policy had recently replaced a more stringent one-occurrence policy.

Our role as a reviewing court on certiorari is not to exercise the agency's underlying discretion ourselves, but to resolve the particular legal claims brought by Bowman on her writ of certiorari. For the

reasons previously stated, we agree with the district court's disposition of those claims and affirm its judgment.

**AFFIRMED.**