Filed 10/3/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ADRIANE CROOKS, | B291068 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS166478) |
| v. | |
| HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Amy D. Hogue, Judge. Affirmed as modified and remanded with directions.

Neighborhood Legal Services of Los Angeles County, David Pallack, Lena Silver and Andres Rapoport for Plaintiff and Appellant.

Joseph L. Stark & Associates, Joseph L. Stark and John M. Bergerson for Defendant and Respondent.

_____

Adriane Crooks appeals from a judgment granting in part and denying in part her motion for a writ of administrative mandamus.  Crooks sought a writ from the superior court directing respondent Housing Authority of the City of Los Angeles (Housing Authority) to reinstate her to the federally funded "Section 8" program for rental assistance for low-income families (the Program).  (See 42 U.S.C. § 1437f.)  Crooks falsely stated that she was single rather than married on two annual eligibility questionnaires.  Following a hearing, a Housing Authority hearing officer found that Crooks engaged in fraud, terminated her participation in the Program, banned her from participating in any federal housing program for a period of 10 years, and ordered her to repay assistance payments she had received in the amount of $21,378.

The trial court reversed the hearing officer's ruling in part. The court found that Crooks's false statements were not fraudulent, but that they were nevertheless sufficient grounds to justify her termination from the Program under regulations that require participants to provide truthful information to the Housing Authority.  Because Crooks's conduct was not fraudulent, the court reversed the hearing officer's 10-year ban and his order requiring Crooks to repay all the benefits she received during the violation period.

Crooks argues that the trial court did not correctly apply the law to the facts.  She argues that the Housing Authority abused its discretion in terminating Crooks's participation in the Program in the absence of any fraud.  She also argues that the Housing Authority did not have the discretion to terminate Crooks's participation in the Program based on a misreport that

2

did not actually have any effect on her benefits. She argues that she should therefore be reinstated to the Program.

We agree with Crooks that the Housing Authority may not terminate a participant from the Program for an immaterial misreport. However, a false answer to a question about marital status does not fall within that category. A Program participant's marital status has a direct and logical relationship to questions of income and occupancy, which are key issues in assessing eligibility for a subsidy.

We also affirm the trial court's finding that Crooks's false statements support her termination from the Program even in the absence of fraudulent intent. The facts show that Crooks made a knowingly false statement about her marital status. That was a conscious breach of her obligation to provide true and complete information requested by the Housing Authority. The Housing Authority had the discretion to terminate her from the Program based upon such conduct.

We therefore affirm the trial court's judgment finding that adequate grounds existed to terminate Crooks from the Program. However, there is another procedural step to consider before Crooks's benefits under the Program are actually terminated.

The governing regulations provide that, in determining whether to terminate assistance, public housing agencies such as the Housing Authority "may" consider all relevant circumstances, including the seriousness of the case and the effect of termination on other family members. (24 C.F.R. § 982.552(c)(2)(i) (2019).) The hearing officer's written ruling does not contain any indication that he made a decision whether to exercise this discretion. Moreover, by reversing the hearing officer's fraud finding, the trial court's decision significantly affected the

3

seriousness of Crooks's violations.  We therefore will direct the trial court to remand the case to the Housing Authority to consider whether to exercise its discretion to take into account other circumstances in determining the appropriate remedy for Crooks's violations.

## BACKGROUND

### 1. Crooks's Violations

Crooks received rental assistance benefits under the Program from 1999 until her termination from the Program in 2016.  She lived in a subsidized unit with her minor son.

For the first 15 years she was in the Program she was unmarried.  In 2014 she married Nathaniel Wills.  Wills died on December 15, 2015, following a motorcycle accident.

On December 10, 2014, and December 9, 2015, Crooks filled out annual eligibility questionnaires that the Housing Authority provided.  The questionnaires included a question about marital status.  The question asked Crooks to check the applicable box for "Married," "Single," "Widow(er)," or "Divorced."  On both occasions Crooks checked the box for "Single."

Based on a referral about a possible violation, the Housing Authority investigated Crooks's marital status.  The resulting investigative report concluded that:  (1) Crooks married Wills in June 2014; (2) Crooks failed to provide true and correct information about her marital status on the 2014 and 2015 questionnaires; (3) Wills's death certificate listed Crooks's address; (4) an "Accurint" report associated Wills with Crooks's address; and (5) a "Utility Locator" report indicated that Wills had made 10 utility payments at Crooks's address.

The Housing Authority notified Crooks that it was terminating her from the Program on the grounds of:  (1) fraud

4

and (2) failure to report her marriage to Wills, who "was residing at the Section 8 unit." Crooks requested a hearing.

## 2. The Administrative Hearing

The hearing took place on August 16, 2016. Following the hearing, the hearing officer found "insufficient evidence to support a finding that [Wills] resided at the assisted residence as an unauthorized tenant." However, he also found that Crooks breached her family obligations under the Program by failing to disclose her true marital status on the eligibility questionnaires. The hearing officer found that this was a willful failure that "constitutes fraud." He ordered Crooks's termination from the Program as of September 30, 2016.

Applying the sanctions for fraudulent conduct set out in the Housing Authority's administrative plan, the hearing officer ordered Crooks to repay the Housing Authority $21,378, representing the benefits she received from December 10, 2014, through the "end of participation." He also banned Crooks from participating in any federally funded housing program for 10 years.

## 3. Crooks's Petition

Crooks filed her petition for a writ of administrative mandate (Petition) on November 23, 2016, and the matter was heard on March 21, 2018. In a written ruling on March 23, 2018, the trial court granted the Petition in part and denied it in part.

The trial court concluded that the weight of the evidence did not support the hearing officer's fraud finding. The court found that the evidence did not show that Crooks "had an intent to deceive" the Housing Authority.

However, the court also concluded that Crooks's "failure to disclose her marital status" provided a separate ground for her

5

termination from the Program because it constituted a violation of a reporting obligation imposed by the governing regulations. The court therefore upheld her termination.

Because the evidence did not support a finding of fraud, the trial court set aside the hearing officer's 10-year participation ban and his order that Crooks repay the benefits she had received. The court remanded the case to the Housing Authority "to determine what amounts, if any, [the Housing Authority] overpaid as a result of [Crooks's] failure to disclose her change in marital status." The trial court entered judgment accordingly on April 16, 2018.

## DISCUSSION

### 1. Standard of Review

In ruling on a petition for a writ of administrative mandate, a trial court reviews the administrative record to determine: (1) whether the administrative agency exceeded its jurisdiction; (2) whether there was a fair trial; and (3) whether there was any prejudicial abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b).) An abuse of discretion "is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

In reviewing an agency's factual findings in cases (such as this) involving a fundamental right, a trial court " 'exercises its independent judgment upon the evidence.' " (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816, fn. 8; *Johnson v. Housing Authority of City of Oakland* (2019) 38 Cal.App.5th 603, 612 (*City of Oakland*) [a decision terminating public assistance benefits affects fundamental vested rights].) This means that a trial court determines whether the agency's findings are supported by the

6

"weight of the evidence." (Code Civ. Proc., § 1094.5, subd. (c); *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32.) On appeal, the appellate court reviews the trial court's findings for substantial evidence. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143–144, fn. 10; *Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 433–434.)

Here, neither party disputes the trial court's factual findings (although, as discussed below, the parties have different interpretations of those findings). Rather, the parties dispute whether the trial court applied the correct legal standard in deciding whether the Housing Authority abused its discretion. Because this raises a legal issue, we review it de novo. (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219.)

**2. Evidence of Crooks's Intent**

Crooks asserts that "[t]here is no dispute regarding the facts as established by the trial court." The Housing Authority similarly asserts that "[t]here is no fact in dispute in this matter."

Yet the parties characterize the trial court's findings in very different ways. Crooks argues that the trial court erred in upholding Crooks's termination from the Program in light of the court's determination that "Crooks's misreport was only an unintentional and immaterial 'error.' " The Housing Authority argues that Crooks "intentionally and deliberately" reported incorrect information concerning her marital status. Before considering the legal significance of the trial court's findings, it is therefore important to articulate a clear interpretation of what the trial court actually found about Crooks's state of mind.

7

The trial court's description of its findings shows that it concluded Crooks did not misreport her marital status as a result of a *desire* to mislead the Housing Authority. Rather, Crooks planned to disclose her marital status eventually but was unable to do so in the manner that she thought was necessary. The trial court cited Crooks's testimony that she thought that she and Wills had to " 'come in . . . together' " to the Housing Authority to report her change in marital status. Crooks testified that they were unable to do so before Wills passed away because Wills's mother became very ill right after he and Crooks were married. The court characterized Crooks's state of mind as a " 'lack of understanding' " rather than fraud or abuse.

The trial court also found that Crooks did not misreport her marital status with the *purpose* of obtaining a greater benefit than that to which she was entitled. The court said so directly in explaining that "there is no evidence [Crooks] intentionally concealed her change in marital status in order to obtain a larger subsidy."

On the other hand, the trial court did not find that Crooks mistakenly checked the wrong box on the two forms asking for her marital status or that she was somehow confused by the question. Rather, the trial court concluded that Crooks understood she was providing incorrect information about her marital status to the Housing Authority. That is shown by the court's inference that Crooks *decided* not to disclose her married status on the questionnaire out of concern that merely "ticking a box" would cause unwarranted action against her.

The trial court's conclusion that Crooks knowingly provided false information about her marital status is also confirmed by colloquy during oral argument on Crooks's Petition. During the

8

argument, the trial court asked a question about Crooks's intent: "And she's looking at the form, and she has to make a decision: Do I tick the box or do I not tick the box. [¶] And if her testimony is I didn't tick the box to say married because I might get in trouble, don't I have an intent—evidence of intent to deceive?" Crooks's counsel responded first by acknowledging, "I think there's no dispute that she intentionally misreported the information." He then offered an interpretation of Crooks's intent that the trial court ultimately accepted in its written decision. He argued that Crooks "plausibly . . . might have thought" that the Housing Authority would erroneously attempt to terminate her from the Program based on her questionnaire responses, as shown by the Housing Authority's actual unsuccessful attempt to terminate her participation in the Program on the unproven ground that Crooks's husband lived with her. In a later discussion about the meaning of this explanation, the trial court described its understanding: "I knew what you meant"; "You're not arguing she accidentally—" "—her hand slipped and she hit the wrong box"; "No, that was a choice she made."

In sum, the trial court found that Crooks knowingly checked the wrong box on the questionnaire in response to a question about her marital status but did not do so with the goal of deceiving the Housing Authority to obtain a greater benefit. Stated in terms of legal conclusions, Crooks made a knowing false statement, but she did not intend to defraud. The question is whether this conduct justifies her dismissal from the Program under the governing regulations.

3. **The Housing Authority Had the Discretion to Dismiss Crooks from the Program for Her False Statement About Her Martial Status**

   A. *The regulatory scheme*

Title 42 United States Code section 1437f authorizes housing assistance payments "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing."  (42 U.S.C. § 1437f(a).)  The rental voucher program that this section establishes (the Program) is funded by the federal government but administered by local public housing agencies (PHA's).  (See 42 U.S.C. § 1437f(b)(1) & (*o*).  The Housing Authority is the local PHA responsible for administering the Program in the City of Los Angeles.

The United States Department of Housing and Urban Development (HUD) is the federal agency responsible for the Program.  HUD has issued various regulations governing the PHA's administration of the Program, found in part 982 of title 24 of the Code of Federal Regulations (2019).[1]

Part 982.552 addresses reasons for denying assistance or terminating participation in the Program.  Part 982.552(c)(1) identifies grounds on which a PHA "may" terminate participation.  The grounds include "fraud, bribery, or any other corrupt or criminal act in connection with any Federal housing program."  (§ 982.552(c)(1)(iv) (2019).)  The grounds also include violation of "any family obligations under the program." (§ 982.552(c)(1)(i) (2019).)  These family obligations are

_____

[1] Unless otherwise stated, subsequent references to "part" refer to the governing regulations.

10

separately identified in part 982.551 and include the obligation to supply truthful information to the PHA.  (§ 982.551(b)(4) (2019).)

**B.**     ***The Housing Authority may terminate a participant from the Program for an intentional and material false statement***

Crooks argues that the regulatory scheme does not permit the Housing Authority to terminate a family from the Program for a mere "immaterial and technical misreport."  She claims that termination may be based only on a misreport that:  (1) is made with fraudulent intent and (2) involves information that is material to a participant's benefits.

We agree that the governing law, including the regulations, Congress's authorizing legislation, and the law concerning agency discretion, requires some *material* violation of a family's reporting obligations to justify the severe sanction of termination from the Program.[2]  However, providing false information about marital status is such a material violation.  And we reject Crooks's argument that a PHA has no discretion to terminate a participant from the Program for an intentional statement that does not amount to fraud.[3]

---

[2] The Housing Authority's brief does not directly address the question of whether a reporting violation must be material to justify termination.  The Housing Authority argues that Crooks's marital status was in fact "material to the evaluation of her eligibility and benefits."  However, it also argues that "any violation of family obligations set forth in Title 24 of the CFR may serve as grounds for termination of participation."

[3] Because Crooks made a knowingly false statement, we need not consider whether an *unintentional* misreport can ever justify termination.

11

### i. *Materiality*
#### (1) *The governing regulations include a materiality element*

A number of considerations support the conclusion that a participant may be terminated from the Program only for a material false statement.  First, the reporting regulations themselves suggest that a family's reporting obligations apply to information that is material to a PHA's function.  Subsection (b)(1) of part 982.551 requires a family to provide information that "the PHA or HUD determines is *necessary* in the administration of the program."  (§ 982.551(b)(1) (2019), italics added.)  And subsection (b)(2) imposes an obligation to provide information that the PHA requests for use in regularly scheduled and interim examinations of "family income and composition in accordance with HUD requirements."  (§ 982.551(b)(2) (2019).)  Thus, these provisions link a participant's reporting obligation to specific information that is important for an agency's function.

Subsection (b)(4) of part 982.551 does require that "[a]ny information" a family supplies must be "true and complete."  However, that subsection is grouped under the general topic of "[s]upplying *required* information" and follows other subsections describing such "required information."  (§ 982.551(b) (2019), italics added.)  The subsection as a whole therefore supports the conclusion that the regulation is most concerned about information that is significant for the administration of the Program.

Second, the Program's authorizing legislation also focuses on a participant's obligation to provide information that is important for the Program's purpose.  Title 42 United States Code section 1437f(*o*)(5)(B) mandates annual reviews of the

12

"family income of each family receiving assistance under this subsection." It requires that a PHA "establish procedures that are *appropriate and necessary* to ensure that income data provided to the agency and owners by families applying for or receiving assistance from the agency is complete and accurate." (*Ibid.*, italics added.) The focus on information that is "appropriate and necessary" for determining income reflects a concern for the truthfulness of information that is *material* to determining a participant's eligibility for a particular subsidy.

Third, the directive in part 982.551 that a PHA "may" terminate program assistance based upon the violation of a family obligation to provide truthful information provides PHA's with discretion in making that decision. Under both California and federal law, administrative agencies tasked with discretionary decisions are generally expected to exercise that discretion within legal limits. (See *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 217–218 (*Skelly*) [State Personnel Board abused its discretion in upholding the petitioner's dismissal from employment where the sanction of dismissal was "excessive and disproportionate to his alleged wrong"]; *Clow v. U.S. Dept. of Housing & Urban Dev.* (9th Cir. 1991) 948 F.2d 614, 617 [court reviewed HUD decision to deny entry into a mortgage assistance program to determine if it was " ' "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" ' "], quoting *Citizens to Protect Overton Park, Inc. v. Volpe* (1971) 401 U.S. 402, 416; 5 U.S.C. § 706(2)(A).) Imposing the severe sanction of dismissal from the Program for an inconsequential misreport could easily be challenged as an abuse of discretion. It is therefore unlikely that part 982.552(c)(1) was intended to

13

provide PHA's with unlimited discretion to terminate assistance based even on immaterial violations.

Finally, and related to the prior point, the consequences of failing to infer a materiality element in part 982.552(c)(1) support the conclusion that such an element exists.  If the governing regulations are construed to permit termination from the Program for a false statement about *any* information a PHA requests, no matter how trivial, those regulations could be applied so broadly as to threaten the due process principle of fair notice.  (See *Sessions v. Dimaya* (2018) __ U.S. __, 138 S.Ct. 1204, 1225 (conc. & dis. opn. of Gorsuch, J. ["Perhaps the most basic of due process's customary protections is the demand of fair notice"].)[4]  For example, the form on which Crooks misreported her marital status asks for a variety of background information.  If any false statement on that form could support termination from the Program, a participant could be denied benefits for failing to report truthful information about, for example, his or her correct telephone number or his or her highest level of education.  Questions that a PHA official might ask during an eligibility interview might be even more wide-ranging.  Interpreting the regulations to include a materiality element avoids the potential constitutional issue of permitting a PHA to terminate a participant from the Program for a false answer to

---

[4] As the Supreme Court has explained, "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns:  first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." (*FCC v. Fox Television Stations, Inc.* (2012) 567 U.S. 239, 253.)

14

any question the PHA might choose to ask. (Cf. *People v. Morera-Munoz* (2016) 5 Cal.App.5th 838, 855–856 (*Morera-Munoz*) [inferring a materiality requirement in a Vehicle Code provision to avoid a constitutional issue].)

## (2) *Definition of materiality*

While we agree that the Housing Authority could terminate Crooks's participation in the Program only for a *material* false statement, we disagree with Crooks on the definition of materiality. Crooks argues that, to be material, a false statement must actually affect a participant's benefits. Crooks relies on the principle that a contract may be terminated only for a material breach that actually causes harm to the other contracting party. (See *Boston LLC v. Juarez* (2016) 245 Cal.App.4th 75, 87.) Crooks claims that because Crooks's false statement about her marital status did not actually affect her benefits, it was not material.[5]

However, the issue of materiality arises here, not in the context of a contract between private parties for their mutual benefit, but in the context of eligibility for a type of public assistance. The prohibition against false statements does not

_____

[5] The trial court did not foreclose the possibility that Crooks's false statements had an effect on her benefit. That is clear from the fact that the court remanded the case to the Housing Authority to "determine what amounts, if any, [the Housing Authority] overpaid as a result of [Crooks's] failure to disclose her change in marital status." The trial court simply decided that the Housing Authority had not "attempted to calculate the amount of housing assistance overpaid by [the Housing Authority]" and had failed to introduce competent evidence supporting its claim that Crooks's husband had "an income stream from which he paid utilities at [Crooks's] unit."

15

simply protect the reasonable expectation of the parties to a contract; it protects the integrity of the Program. Moreover, the regulations in question are federal provisions intended to govern the operation of a federally funded Program. The most relevant definition of materiality is therefore the definition that generally applies to federal statutes addressing false statements made to government agencies.

Under that definition, a "concealment or misrepresentation is material if it 'has a natural tendency to influence, or was capable of influencing, the decision of' the decisionmaking body to which it was addressed." (*Kungys v. United States* (1988) 485 U.S. 759, 770, citing *Weinstock v. United States* (D.C. Cir. 1956) 231 F.2d 699, 701–702.) To be material, a statement need not have had actual influence. Rather, " '[t]he false statement must simply have the capacity to impair or pervert the functioning of a government agency.' " (*Morera-Munoz, supra,* 5 Cal.App.5th at pp. 858–859, quoting *U.S. v. Boffil-Rivera* (11th Cir. 2010) 607 F.3d 736, 741–742.)

As the court noted in *Morera-Munoz,* that standard of materiality is similar to the standard applied under California law in other contexts, including fraud in the inducement of a contract and perjury. (*Morera-Munoz, supra,* 5 Cal.App.5th at pp. 858–859). In *Morera-Munoz*, the court relied upon the federal standard of materiality in defining the materiality element applicable to a Vehicle Code provision that prohibited making false statements to a police officer. Similarly, here, we conclude that the generally applied federal standard is appropriate. The standard is an objective one that focuses on whether the statement in question had the *potential* to affect the decision of a

16

government agency, not whether it actually did so.  (See *Morera-Munoz,* at p. 859.)

### (3)   *A false statement about marital status is material*

A false statement about marital status relates directly to a core function of a PHA to determine and verify a Program participant's eligibility and benefit amount.  A PHA's mandated annual examination focuses on "family income and composition." (§ 982.516(a)(1) (2019).)  A participant's marital status does not *necessarily* affect his or her income or the number and identity of persons living in his or her residence.  But it might.  A spouse is another potential source of family income and another person who might be living in the residence.  Marital status is therefore within the scope of topics that could influence a PHA's benefits decision.

Moreover, as the Housing Authority points out, if it had known Crooks's true marital status, the knowledge might have prompted earlier investigation.  Whether such an investigation would ultimately have led to a change in Crooks's benefits does not matter in determining whether Crooks's false statement was material.  A false statement about marital status is within the category of violations that have the " 'capacity to impair or pervert the functioning of a government agency.' " (*Morera-Munoz, supra,* 5 Cal.App.5th at pp. 858–859, quoting *U.S. v. Boffil-Rivera*, *supra*, 607 F.3d at pp. 741–742.)  It is therefore material.

### ii.   *Intent*

Crooks argues that the regulatory scheme supports her claim that only fraudulent statements can support termination from the Program.  We disagree.  The regulations provide a PHA

17

with the discretion to terminate a participant from the Program for knowingly false statements, even if the participant did not make the statements with the fraudulent intent to obtain unauthorized benefits.

Crooks argues that part 982.552 distinguishes between circumstances in which a PHA "must" terminate participation in the Program and circumstances in which it "may" do so. (See § 982.552(b) & (c) (2019).) That difference is of no consequence here because both the violation of a family obligation and fraud are included within the provision that permits, but does not require, termination. (§ 982.552(c)(1)(i) & (iv) (2019).)

Crooks also argues that the Housing Choice Voucher Program Guidebook prepared by HUD distinguishes between "errors or omissions" and "fraud and abuse." (HUD, Off. of Public and Indian Housing, Voucher Program Guidebook, Housing Choice (Apr. 2001) Program Integrity, ch. 22, pp. 22-1 – 22.2 (Guidebook).) Crooks claims that because the trial court found that Crooks's false statements amounted to conduct that the Guidebook categorizes as an "error/omission" rather than "fraud/abuse," the trial court should have concluded that there were no grounds for termination.

Preliminarily, Crooks does not provide any support for her claim that the Housing Authority was obligated to follow the directions in the Guidebook rather than independently interpret the governing regulations. Title 24 Code of Federal Regulations part 982.52(a) (2019) provides that a PHA "must comply with HUD regulations and other HUD requirements for the program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program

directives." The Guidebook is not a regulation, and Crooks does not address whether it is a "binding program directive."[6]

In any event, even if the Guidebook establishes policy, it does not support Crooks's position. Crooks cites a portion of the Guidebook that discusses "corrective action" when an error or omission results in a family payment that is incorrectly set too low (resulting in an overpayment by the PHA). The Guidebook explains that, when the family is at fault, the family must repay the PHA and, if it fails to do so, "the PHA may terminate the family's assistance." (Guidebook, *supra*, at p. 22-12.) But the Guidebook does not state that an error or omission can justify termination from the Program *only* if a participant is first given the opportunity to repay any overpayment. Such a requirement would be inconsistent with the governing regulation, which states that a PHA "may *at any time* deny program assistance for an applicant, or terminate program assistance for a participant, for any of the following grounds," which include violation of a family obligation. (§ 982.552(c)(1) (2019), italics added.)

Such a requirement would also be inconsistent with the fact that the breach of a repayment agreement is a separate ground for termination from the Program under part 982.552. (See § 982.552(c)(1)(vii) (2019).) If the breach of a reporting obligation could cause termination from the Program only if it also met some other ground for termination (such as fraud or

---

[6] We note that HUD apparently is preparing a new version of a guidebook that specifically uses the term "must" to designate "when a policy must be adopted as required by HUD." (See <https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/guidebook> [as of Sept. 20, 2019], archived at <https://perma.cc/9H4E-EAZ9>.)

19

breach of a repayment agreement), there would be no need for the separate provision permitting termination for violation of a reporting obligation.

The Guidebook ultimately does not mandate any particular sanctions for errors and omissions *or* fraud but simply points out that the distinction is important and directs that PHA's "carefully analyze the unique circumstances of the case to determine how to best handle the situation." (Guidebook, *supra*, at p. 22-1.) The Guidebook also emphasizes the importance of distinguishing between "unintentional and intentional misreporting." (*Ibid*.) However, it notes that an error or omission "may be intentional or unintentional" and leaves to the PHA's the task of establishing "policies and procedures for fair and consistent treatment of cases of intentional misreporting, abuse, and fraud." (*Ibid*.)

The Housing Authority has established such policies and procedures in its "Section 8 Administrative Plan." While that plan distinguishes between cases of fraud and violation of family obligations, it does not state that a participant may be terminated from the Program only for fraud. Rather, it provides that the Housing Authority "*may* deny or terminate housing assistance" for the failure to meet family obligations, but that it "*terminates* assistance" if any family member commits "fraud, bribery, or any other corrupt or criminal act in connection with any federal housing program." (Housing Authority, City of Los Angeles, Section 8 Administrative Plan (Oct. 2016) Terminations and Denials, ch. 13, p. 13-12, italics added.)

The Housing Authority's policy is consistent with the fact that, as discussed above, part 982.552 establishes separate provisions for termination from the Program for fraud and for

violation of a family obligation (including the family reporting requirements). There would be no need for the latter if termination could result only from proof of the former.

Crooks draws the opposite conclusion from these separate provisions. Citing *McClarty v. Greene Metropolitan Housing Authority* (2011) 196 Ohio App.3d 256 [963 N.E.2d 182], Crooks argues that permitting termination from the Program for misrepresentations not amounting to fraud would make the fraud provision superfluous. The conclusion does not follow. Rather, it seems likely that the separate provisions in part 982.552 for fraud and for violation of family obligations were intended to recognize the difference in seriousness between the two types of offenses, but that a participant may be terminated from the Program in appropriate circumstances for either violation. Indeed, that is what the Housing Authority's policy has done by stating that it "terminates" Program participation for fraud but that it "may" terminate participation for breach of a family obligation. That interpretation is also most consistent with the introductory language of part 982.552(c)(1), which states that a PHA may terminate program assistance for "*any* of the following grounds," which include both violation of a family obligation and fraud. (Italics added.)

4. **The Housing Authority Did Not Abuse Its Discretion in Upholding Crooks's Termination from the Program for Her Material False Statements**

As mentioned, a court may grant a petition for a writ of mandate to set aside a disciplinary decision by a public agency that is "excessive and disproportionate to [the] alleged wrong." (*Skelly, supra,* 15 Cal.3d at p. 217.) Crooks argues that the

Housing Authority's decision to terminate her from the Program falls within that category.

For the reasons discussed above, we reject the argument. Crook's false statements were material, and she made them while knowing that they were false. Her conduct therefore falls within the range of the Housing Authority's discretion to order termination from the Program.

5. **The Housing Authority Must Decide Whether to Exercise Its Discretion to Consider the Circumstances Identified in Part 982.552(c)(2)(i)**

Part 982.552(c)(2)(i) provides that, in determining whether to terminate assistance because of a family member's action or failure to act, a PHA "may consider all relevant circumstances such as the seriousness of the case, the extent of participation or culpability of individual family members, mitigating circumstances related to the disability of a family member, and the effects of denial or termination of assistance on other family members who were not involved in the action or failure." There is no indication in the administrative hearing officer's decision here that he considered these circumstances before ordering that Crooks be terminated from the Program.

Relying on several cases from Illinois, Crooks argues that, despite the discretionary language of part 982.552(c)(2)(i), its direction that a PHA "may" consider all the relevant circumstances is actually mandatory. Crooks argues that, if there is no such requirement, then "[part] 982.552's distinction between mandatory and discretionary terminations becomes meaningless."

22

We do not agree. The provision at issue appears in subsection (c) of part 982.552, which addresses circumstances in which a PHA "may" terminate program assistance. There is no inconsistency in directing that, along with the exercise of a PHA's discretion in determining whether to terminate a participant from the Program on one of the grounds listed in subsection (c), the PHA "may" consider the factors identified in subsection (c)(2)(i). We find the reasoning of the Iowa Supreme Court persuasive in rejecting an identical argument to the one Crooks makes here: "If the PHA 'may' consider mitigating factors, then it may consider all of them, some of them, or none of them. This does not render the distinction between mandatory and discretionary terminations 'meaningless' because the PHA retains the discretion not to terminate." (*Bowman v. City of Des Moines Municipal Housing Agency* (Iowa S.Ct. 2011) 805 N.W.2d 790, 799, fn. 7.)

However, as Crooks points out, the failure to recognize the authority to exercise discretion can itself be grounds for reversal. (*Fletcher v. Superior Court* (2002) 100 Cal.App.4th 386, 392; cf. *City of Oakland, supra*, 38 Cal.App.5th at p. 615 ["a 'hearing officer's failure to make any findings, coupled with his failure to indicate any awareness that he was explicitly authorized by HUD to exercise his discretion to take into account relevant circumstances' is contrary to established law"], citing *Carter v. Lynn Housing Authority* (2008) 450 Mass. 626 [880 N.E.2d 778, 786–787].) There is nothing in the hearing officer's decision indicating that he either exercised his discretion to consider the factors identified in part 982.552(c)(2)(i) or that he was aware of his discretion to consider those factors and chose not to do so. As important, the hearing officer decided that Crooks's conduct was

23

fraudulent.  The trial court's ruling, which the Housing Authority has not appealed, overturned that finding.  Thus, the legal significance of the facts that the hearing officer considered has changed significantly since he ruled.

We will therefore direct the trial court to remand the case to the Housing Authority for it to decide whether to exercise its discretion to consider the factors identified in part 982.552(c)(2)(i).  Consistent with the discussion above, the Housing Authority is not *required* to consider those factors, but it should make the decision whether to do so based on the current record.

## DISPOSITION

The trial court's judgment is modified to direct that, on remand of the case to the Housing Authority, the Housing Authority must decide whether to exercise its discretion to consider the factors identified in title 24 Code of Federal Regulations part 982.552(c)(2)(i) (2019) before determining if Crooks's participation in the Section 8 rental assistance program should be terminated.  In all other respects, the judgment is affirmed, including the trial court's finding that "failing to disclose the change in Petitioner's marital status was proper grounds for termination under Section 13.8.5 of [the Housing Authority's] Administrative Plan."  In the interests of justice, the parties shall bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


                                              LUI, P. J.
We concur:



CHAVEZ, J.



HOFFSTADT, J.

25